UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

LAURA HUCK,

                  Plaintiff,                    No. 06-CV-14562-DT
                                                        Hon. Gerald E. Rosen

vs.

ELLIOT I. GREENSPAN, D.O, P.C. & ASSOC.
ELLIOT GREENSPAN, and MARK LEBLANC,

                  Defendants.
_____/

OPINION AND ORDER REGARDING
DEFENDANTS' MOTION FOR SUMMARY JUDGMENT

At a session of said Court, held in
the U.S. Courthouse, Detroit, Michigan
on     January 30, 2009

PRESENT:  Honorable Gerald E. Rosen
                    United States District Judge

## I. INTRODUCTION

This Title VII/Elliot-Larsen pregnancy discrimination/Family Medical Leave Act

action is presently before the Court on Defendant's Fed. R. Civ. P. 56 Motion for

Summary Judgment. Plaintiff has responded to Defendant's Motion. Having reviewed

and considered the parties' briefs, supporting documents, and the entire record of this

matter, the Court has determined that oral argument is not necessary.  Therefore, pursuant

to Eastern District of Michigan Local Rule 7.1(e)(2), this matter will be decided on the

1

briefs.  This Opinion and Order sets forth the Court's ruling.

## II.  PERTINENT FACTS

Plaintiff Laura Huck is a former employee of Defendant Elliot I. Greenspan, D.O.,
P.C. & Associates (the "Medical Practice"). Defendant Dr. Elliot Greenspan is President
of the Medical Practice.  Defendant Mark LeBlanc is an attorney with whom Dr.
Greenspan consults on business operations and legal matters, and who, during a portion
of the relevant time period, managed the Practice while Dr. Greenspan recuperated from a
heart attack.

Huck was hired by the Medical Practice on September 17, 2001.  She worked for
the Practice at its Wixom, Michigan office from the date of her hire until her employment
was terminated on May 13, 2005. [Plaintiff's Dep., p. 75.]

Plaintiff was first employed as a medical biller making $14 per hour at the Medical
Practice. While working in this position, Huck reported to Theresa Duncan ("Duncan"),
the office manager. As a medical biller, Plaintiff worked approximately 40 hours per
week.

It was not long after Plaintiff began working at the Practice that Ms. Duncan began
training Plaintiff to take over her administrative responsibilities in anticipation of her
taking a maternity leave in the summer of 2002.  Then, when Ms. Duncan returned from
her leave, Huck and Duncan effectively became co-managers, each sharing certain duties,
while others were divided up in ways that worked out best for both of them.  During this
period of time, both Ms. Duncan and Plaintiff reported directly to Dr. Greenspan.

2

Over time, Ms. Duncan and Plaintiff became friends outside of work. However, their relationship deteriorated some time around July of 2004, when Ms. Duncan went on vacation.  While Ms. Duncan was away, Plaintiff brought to Dr. Greenspan's attention certain concerns she claimed the office staff had shared with her about Ms. Duncan. Following that meeting, Dr. Greenspan changed some of Plaintiff's and Ms. Duncan's duties.  Greenspan relieved Ms. Duncan of her oversight responsibilities of the front desk and gave these responsibilities to Plaintiff. After these changes were made, Ms. Duncan's and Plaintiff's relationship faltered, ultimately evolving into a noticeable schism between the two. While each party tried to mend the relationship, it would never recover.

In September of 2004, Dr. Greenspan suffered a heart attack and did not return to practice until February of 2005. During this time, Dr. Greenspan ceased to have weekly meetings with Plaintiff and Ms. Duncan.  Although he maintained some degree of involvement with the Medical Practice, Greenspan delegated his managerial responsibilities to Mark LeBlanc. On one visit to the Practice while recuperating in December of 2004, Dr. Greenspan communicated to Huck and Duncan his concern that there were too many physicians just "standing around" and too few incoming patients. He also told Plaintiff that he thought the office was over staffed in general, and this comment was memorialized by Plaintiff in her own handwritten notes.

It was while Dr. Greenspan was on medical leave that Mr. LeBlanc recommended as a cost cutting measure  that Dr. Greenspan reduce his staff.  Specifically, LeBlanc recommended that Dr. Greenspan not renew contracts for two of the physicians working

3

at the Practice.  LeBlanc also recommended to Greenspan that he terminate Plaintiff's employment, as he viewed Huck's job as merely duplicative of Theresa Duncan's job, and LeBlanc considered Ms. Duncan better qualified.  Dr. Greenspan, however, refused to take any action at that time.

Meanwhile, in December 2004, Plaintiff became pregnant. After definitively learning that she was pregnant in January of 2005, she met with Dr. Greenspan to discuss his facilitating a better working relationship between Ms. Duncan and herself.  Shortly thereafter, however, some complications with her pregnancy developed, and Plaintiff requested, and was granted, a two-week FMLA leave.

Plaintiff returned to work on February 7, 2005. Upon her return, Plaintiff again met with Dr. Greenspan on February 8, 2005, and told him for the first time that she was carrying twins.  Dr. Greenspan congratulated her and they talked about the subject briefly. Plaintiff then again asked Dr. Greenspan to help mend the rift between herself and Ms. Duncan. According to Plaintiff, Dr. Greenspan's response was to change both her and Ms. Duncan's responsibilities again.  It is disputed whether Huck requested that her duties be changed or whether Dr. Greenspan unilaterally made the decision.  In any event, as of February 8, 2005, Plaintiff was relieved of her billing responsibilities, and she was made primarily responsible for running the front desk and for maintaining an attractive office, as well as given the responsibility of making sure medical residents arrived on time.  Her desk was removed from the billing department and she was provided, instead, work space in the occupational medicine area of the practice.

4

Plaintiff apparently was not happy with her new duties and new work area.  In her notes of the meeting that took place on February 8, 2005, Plaintiff wrote that she "told him [Greenspan] [the new duties were] too stressful" and that "[she] d[id]n't want to be out front."  Dr. Greenspan told Plaintiff she would be working a 9 to 5 schedule and she would be relieved of her managerial duties in terms of supervising employees.[1]  Dr. Greenspan also informed Plaintiff that she would be paid hourly instead by salary, however, her benefits and pay rate remained the same. Plaintiff asserts that after this meeting she never met with Dr. Greenspan again.

On March 29, 2005, Huck submitted a twelve (12) week FMLA leave request to Christy Hiipakka, the Practice's Human Resources Director, for a leave to commence on an unspecified date in the future based upon the anticipated birth of her twins in August. The leave request was approved that same day.

At some point in time shortly thereafter, several employees reported to LeBlanc and Greenspan that Huck had lost her temper on several occasions and was causing disruptions in the office.  Huck admits that she "may have raised [her] voice," on occasion.  Dr. Greenspan testified that because Plaintiff was rude, unprofessional with

---

[1]  According to Defendants, the move from management back to non-management employment was done at Plaintiff's request.  Plaintiff admitted receiving a letter with her paycheck following the February 8, 2005 meeting with Dr. Greenspan which stated "This letter is to confirm [] our meeting on 2-8-05 in which you requested to no longer be considered management to Wixom Health Center[.]  I'm notifying you that we accept this change at the clinic.  However, all of your prior duties and those outlined and discussed at our meeting will continue."  *See* Plaintiff's Dep., pp. 367-68.  Plaintiff further admitted that she never disputed the letter or its contents and never discussed the letter with Dr. Greenspan.  *Id.*

5

patients and raised her voice with them, and because he knew that the Practice needed to cut costs, he decided to terminate Plaintiff's employment.

The day when the decision was made to fire Huck, Karen Lajko, who was in charge of sales and marketing for the Wixom office's occupational medicine division, met with Greenspan and LeBlanc to discuss, according to her, chaos in the occupational medicine division associated with situations involving Huck.  After listening to Lajko's account of Huck's behavior and the problems she was causing in the office, Greenspan decided to terminate Plaintiff's employment.[2]

Mark LeBlanc testified about Ms. Lajko's presentation of her concerns and the ultimate decision to terminate Plaintiff:

> Q:     Do you remember when the decision was made by Dr. Greenspan to lay her [Plaintiff] off?
>
> A:     I do.
>
> Q:     When was that?
>
> A:     During that meeting where Karen, it was in his office the one we just discussed, on Tuesday prior to the Friday she [Plaintiff] was laid off, and after Karen finished her speech.  I think with no one else speaking in between I looked at Dr. Greenspan and I said "my recommendations from the beginning of the year remain the same. And do with it what you will." And he then protested the recommendation by saying words to the effect of, I'm not quoting him but this is as close as I can come, "no, because if I lay her off she's the type that's going to sue and we're going to have to deal with that."  I responded to him in some fashion.  He said that she's pregnant and that she will sue us.  He mentioned the pregnancy.  I said, "pregnancy is

---

[2]  Defendants characterize the decision as not being one of "termination" of Plaintiff's employment but rather as one of an indefinite "layoff."  In any event, it is undisputed that Plaintiff has never been recalled from her purported "layoff."

6

> not a factor here.  Pregnancy is not a consideration here.  And you can't let
> the fact that someone might sue you run your business decisions."  He was
> silent for an extended period of time and finally he said, "fine, we will lay
> her off."

[LeBlanc Dep., Plaintiff's Ex. G., pp. 72-73.]

Plaintiff was terminated on May 13, 2005, and was informed of her termination by

Defendant LeBlanc.  She was told that her termination was due to budgetary reasons.

The next day, Karen Lajko spoke at a staff meeting which had ostensibly been

convened to boost morale, and allegedly told other employees at that meeting that Huck

was terminated because of her pregnancy.  According to employees who were present at

the meeting, Lajko said that Huck was let go because, being pregnant, she "needed to

relax a little bit."[3]  According to Lajko:

> A:      The office meeting was actually supposed to be. . .we were
>          supposed to all gather basically it was about, you know,
>          bringing up morale, kind of getting things done.  I remember
>          basically, my, my -- I was opening.  I was basically the very
>          first person to speak.  And again, knowing the girls, the girls
>          like I know the girls, I basically when I first walked up I said,
>          "you know what, there's a big elephant in the room, let's get
>          it out."  Basically what had always been kind of . . .
>          . . . what had always been kind of what they'd done at Wixom
>          Health is things would happen and nobody would ever
>          explain them.  You know, Laura was a friend of people's and
>          people cared about Laura, and there was already enough anger
>          in the place they needed to understand that, you know what,
>          it's not time to be angry, it's time to move forward.  And
>          basically what I did was I shared with them my story about
>          [my pregnancy with] the girls [twins] and I just said, "you

---

[3]  Lajko does not deny that she told the assembled employees that Plaintiff had been laid
off because she needed to relax a little bit because of her pregnancy; she stated only that
she "d[id]n't recall saying that." [Lajko Dep., p. 52.]

> know what, again, she's going to be taken care of, she just
> needs to relax and we all need to basically support her in
> that." Just you know what, she is -- because she was upset."
> She was calling everybody. Again, she just needed to stop,
> she needed to stop.

[Lajko Dep., p. 53 (some internal punctuation added for clarification).]

Others present at the meeting attested to the fact that Lajko referenced the fact that she [Lajko] herself had had twins before and that Lajko expressed that she was concerned about Plaintiff working because she was pregnant.[4] LeBlanc was present at this meeting but did not comment in response to any of Lajko's remarks. (LeBlanc claims that he did not hear Lajko's reference to pregnancy and would have protested had he heard the comment.)

Plaintiff thereafter initiated this pregnancy discrimination action against Dr. Greenspan, Mr. LeBlanc, and the Medical Practice. In her Complaint, Plaintiff alleges both Title VII and Elliott-Larsen claims of pregnancy discrimination (Counts I and IV); hostile work environment (Counts II and V); and retaliation (Counts III and VI); as well as claims of violation of the Family Medical Leave Act (the "FMLA") (Count VII) and discrimination and retaliation under the FMLA (Count VIII (mislabeled in the Complaint as "Count XI")).

_____

[4] These other employees include Amy Mello and Jessica Golemba. They told Plaintiff in separate telephone conversations that Karen Lajko told the assembled group of Medical Practice employees that Plaintiff was terminated because she was pregnant. Plaintiff tape recorded the telephone conversations and Plaintiff's counsel had the tapes transcribed by a court reporter. *See* Affidavit of Marla Linderman, Plaintiff's Ex. P. The tapes were subsequently played at Mello's and Golemba's depositions and the deponents authenticated their voices and what they said in the recorded conversations.

III.  DISCUSSION

A.  STANDARDS APPLICABLE TO MOTIONS FOR SUMMARY JUDGMENT

Summary judgment is proper "'if the pleadings, depositions, answer to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law.'" Fed. R. Civ. P. 56(c).

Three 1986 Supreme Court cases -- *Matsushita Electrical Industrial Co. v. Zenith Radio Corp.*, 475 U.S. 574 (1986); *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242 (1986); and *Celotex Corp. v. Catrett*, 477 U.S. 317 (1986) -- ushered in a "new era" in the standards of review for a summary judgment motion.  These cases, in the aggregate, lowered the movant's burden on a summary judgment motion.[5]  According to the *Celotex* Court,

In our view, the plain language of Rule 56(c) mandates the entry of summary judgment, after adequate time for discovery and upon motion, against a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof.

*Celotex*, 477 U.S. at 322.

After reviewing the above trilogy, the Sixth Circuit established a series of principles to be applied to motions for summary judgment.  They are summarized as follows:

---

[5]  "[T]aken together these three cases signal to the lower courts that summary judgment can be relied upon more so than in the past to weed out frivolous lawsuits and avoid wasteful trials. . . ."  10A C. Wright, A. Miller, M. Kane, Federal Practice & Procedure 3d, § 2727.

9

* The movant must meet the initial burden of showing "the absence of a genuine issue of material fact" as to an essential element of the non-movant's case. This burden may be met by pointing out to the court that the respondent, having had sufficient opportunity for discovery, has no evidence to support an essential element of his or her case.

* The respondent cannot rely on the hope that the trier of fact will disbelieve the movant's denial of a disputed fact, but must "present affirmative evidence in order to defeat a properly supported motion for summary judgment."

* The trial court no longer has the duty to search the entire record to establish that it is bereft of a genuine issue of material fact.

* The trial court has more discretion than in the "old era" in evaluating the respondent's evidence. The respondent must "do more than simply show that there is some metaphysical doubt as to the material facts." Further, "[w]here the record taken as a whole could not lead a rational trier of fact to find" for the respondent, the motion should be granted. The trial court has at least some discretion to determine whether the respondent's claim is plausible.

*Betkerur v. Aultman Hospital Association*, 78 F.3d 1079, 1087 (6th Cir. 1996). *See also, Street v. J.C. Bradford & Co.*, 886 F.2d 1472, 1479-80 (6th Cir. 1989). The Court will apply the foregoing standards in deciding Defendants' Motion for Summary Judgment in this case.

B.    PLAINTIFF'S TITLE VII CLAIMS ARE NOT BARRED BY
      <u>PROCEDURAL DEFECTS WITH REGARD TO HER EEOC CHARGE</u>

Defendants first argue that Plaintiff's Title VII claim against the Medical Practice should be dismissed for lack of subject matter jurisdiction because (1) Plaintiff's EEOC Charge was not timely filed and (2) notice of the Charge was not timely given to the employer.

42 U.S.C. § 2000e-5 (1) provides in pertinent part:

10

> [I]n a case of an unlawful employment practice with respect to which the person aggrieved has initially instituted proceedings with a State or local agency with authority to grant or seek relief from such practice or to institute criminal proceedings with respect thereto upon receiving notice thereof, such charge shall be filed by or on behalf of the person aggrieved within three hundred days after the alleged unlawful employment practice occurred.

In this case, the last "alleged unlawful employment practice" Plaintiff asserts took place on May 13, 2005, the date on which she was fired. Defendants point to a date stamp on the "Charge of Discrimination" form showing a date of March 17, 2006, to support their claim that Plaintiff's Title VII Charge was not timely-filed [*See* Charge of Discrimination, Defendant's Ex. G]. If the Charge was filed on March 17, 2006, as the Defendants assert, Plaintiff's Title VII claim would be time-barred as it would have been filed eight days after the expiration of the 300 days allotted under the statute (308 days after the date of Plaintiff's termination). However, the Court notes that Plaintiff's signed Charge is dated "2/18/06," and it was notarized by Gretchen Houden, Notary Public for Livingston County, on that same date. Plaintiff states that it was on this date, February 18, 2006, that she filed her Charge. If the Charge was filed on February 18, 2006, Plaintiff's Charge would fall well within the 300 days allowed under the statute.

As further evidence of timely filing her Charge, Plaintiff points to the EEOC's notification of termination of the investigation to show that she filed her Charge on February 18, 200**6**. [*See* EEOC Notice of Termination of Investigation, Plaintiff's Ex. O]. The narrative in the Notification of Termination of Investigation reports the date of Plaintiff's filing of her Charge contesting the termination of her employment as February

11

18, 200**5**.  The Court recognizes, however, that the indication of "2005" as the year must be a typographical error, because Plaintiff's firing did not occur until May 17, 2005 -- nearly three months later.  The EEOC, thus, necessarily must have meant that her Charge contesting her firing was filed on February 18, 200**6**.[6]

Based upon the forgoing, the Court finds that the Plaintiff has provided sufficient evidence that the charge was timely filed.  Both the notary public and the EEOC report recognize that the charge was filed on February, 18, 2006, well within the 300 days allowed.  Therefore, Defendants' motion for Summary Judgment on the basis of untimely filing of the Charge will be denied.

Defendants also argue that notice of the filing of the Charge was not given to the employer until more than 10 days after the charge was filed as required by Title VII

---

[6]  Defendants place far too much weight on the EEOC's date stamp on the Charge. There is nothing in the date stamp indicating that this was the "filed" date of the Charge. Rather, it appears that the stamp merely indicates that the date on which the Charge was received by the EEOC's Detroit District Office was March 17, 2006.  The face of Plaintiff's Charge, in fact, indicates that the Charge was actually originally filed with the Michigan Department of Civil Rights (the "MDCR"), *not* the EEOC.  That the Charge was not originally filed with the EEOC is evidenced by the fact that Plaintiff marked the box on the Charge requesting "I also want this charge filed with the EEOC." *See* Defendants' Ex. G.

The MDCR and the EEOC operate together pursuant to a work sharing agreement under which the EEOC and the MDCR have each designated the other as its agent for the purpose of receiving charges.  *See Dircken v. State of Mich., Dept. of Educ., Vocational Rehabilitation*, 35 F.3d 565, 1994 WL 443499 (6th Cir. 1994).  Under a work sharing agreement between the two agencies, the state agency acts as agent for the EEOC, thus filing a charge with the state agency constitutes a simultaneous filing with the EEOC.  *Id*.; *see also Brown v. Crowe*, 963 F.2d 895, 898 (6th Cir.1992). Plaintiff's filing of a charge of discrimination on February 18, 2006 with the MDCR accordingly constituted a simultaneous -- and timely -- filing with the EEOC.

regulations. *See* 29 C.F.R. § 1601.14(a). The Charge was filed on February 18, 2006, but the Defendants claim they did not receive notice of the Charge until March 29, 2006. However, as noted, the EEOC apparently did not receive a copy of the Charge from the MDCR until March 17, 2006. *See* note 6 *supra*. Therefore, Defendants received notice of the Charge within 10 business days of the EEOC's receipt of the Charge.[7] In any event, assuming that notice of the Charge was not timely provided in accordance with the regulations, the delay in providing notice complained of by Defendants is not grounds to dismiss Plaintiff's claims.

It is well-settled in the Sixth Circuit that punishment for the EEOC's ignoring of its own regulations should not be thrust upon the plaintiff. *Nichols v. Muskingum College*, 318 F.3d 674, 678 (6th Cir. 2003). Though *Nichols* involved the EEOC's failure to transfer the plaintiff's charge to the appropriate state agency, the Court finds its reasoning persuasive. It was the duty of the EEOC to provide the employer with notice of the Charge. The EEOC's misfeasance should not be held against the Plaintiff. *Id.* Therefore, the Court finds that any failure of the EEOC to timely notify Defendants of the Charge does not provide a basis for dismissing Plaintiff's complaint.[8]

---

[7] March 17, 2006 was a Friday.

[8] In her brief, the Plaintiff argues that the Defendants failed to raise the EEOC's failure to provide notice as an affirmative defense, and therefore it should be deemed to have been waived. The Court's rejection of Defendants' untimely notice argument makes it unnecessary to address this issue. However, the Court notes that Defendants sufficiently preserved this defense by broadly asserting "Plaintiff's claims are barred, in whole or in part, by the applicable statute of limitations" and "Plaintiff has failed to exhaust her administrative remedies at the Equal Employment Opportunity Commission pursuant to

B.      PLAINTIFF HAS FAILED TO PRODUCE DIRECT EVIDENCE OF
        DISCRIMINATION

Title VII provides that "[i]t shall be unlawful employment practice for an employer

. . . to discharge or discriminate against . . . any individual with respect to his

compensation, or terms, conditions, or privileges of employment because of such

individual's . . . sex." 42 U.S.C. § 2000e-2(a)(1).  In 1978, Congress enacted the

Pregnancy Discrimination Act, amending Title VII to clarify that discrimination based on

pregnancy is deemed to be discrimination based on sex under the Act.  42 U.S.C. §

2000e(k).  Thus, "[i]t is now well settled that a claim of discrimination on the basis of

pregnancy must be analyzed in the same manner as any other sex discrimination claim

brought pursuant to Title VII." *Boyd v. Harding Academy of Memphis, Inc.,* 88 F.3d 410

(6th Cir. 1996).

It is well-established that the burden is on an employment discrimination plaintiff

to establish a *prima facie* case of discrimination. *See Lautermilch v. Findlay City Schools,*

314 F.3d 271, 275 (6th Cir.), *cert. denied,* 540 U.S. 813 (2003); *McDonnell Douglas*

*Corp. v Green*, 411 U.S. 792, 802 (1972)*.*  A Title VII plaintiff may establish a *prima*

*facie* case either by presenting direct evidence of intentional discrimination by the

defendant, *Terbovitz v. Fiscal Court*, 825 F.2d 111, 114-15 (6th Cir, 1987) (citing *Trans*

*World Airlines, Inc. v. Thurston,* 469 U.S. 111, 121, 105 S.Ct. 613, 621-22 (1985)), or by

_____

Tittle VII of the Civil Rights Act of 1964." [*See* Defendants' Affirmative Defenses, filed
March 9, 2007].

14

showing the existence of circumstantial evidence which creates an inference of discrimination, *McDonnell Douglas*, 411 U.S. at 802, 93 S.Ct. at 1824. *See Talley v. Bravo Pitino Restaurant, Ltd.,* 61 F.3d 1241, 1246 (6th Cir. 1995). Plaintiff here contends that she can make out her claim of pregnancy discrimination under both theories.

"Direct evidence" of discrimination is "evidence which, if believed, requires the conclusion that unlawful discrimination was at least a motivating factor in the employer's actions." *See Talley,* 61 F.3d at 1268; *Hazle v. Ford Motor Co.,* 464 Mich. 456, 462, 638 N.W.2d 515, 520 (2001) (quoting *Jacklyn v. Schering-Plough Healthcare Products Sales Corp.*, 176 F.3d 921, 926 (6th Cir. 1999)). When a plaintiff can cite direct evidence of discrimination, the *McDonnell Douglas/Burdine* shifting burdens of proof are not applicable. *Trans World Airlines, Inc. v. Thurston*, 469 U.S. 111, 121, 105 S.Ct. 613 (1985); *DeBrow v. Century 21 Great Lakes, Inc.*, 463 Mich. 534, 539, 620 N.W.2d 836, 838 (2001). The presentation of direct evidence is generally sufficient to submit the plaintiff's case to the jury. *Harrison v. Olde Financial Corp*, 225 Mich. App. 601, 610; 572 NW2d 679 (1997). However, to withstand summary judgment, the plaintiff's evidence must be admissible. Fed. R. Civ. P. 56(e). Inadmissible hearsay evidence cannot be considered. *Hartsel v. Keys*, 87 F.3d 795, 803 (6th Cir. 1996), *cert. denied*, 519 U.S. 1055 (1997); *Jacklyn v. Schering-Plough Healthcare Prod. Sales Corp.*, 176 F.3d 921, 927 (6th Cir. 1999).

Here, Plaintiff points to the statements of Karen Lajko, director of sales and

15

marketing for the Medical Practice's occupational medicine division, as direct evidence of discrimination by the Practice, Dr. Greenspan and Mr. LeBlanc.  Ms. Lajko, who like the plaintiff had been previously pregnant with twins, communicated her concerns about Plaintiff's pregnancy to Dr. Greenspan a few days prior to Plaintiff's termination. This meeting took place on May 10, 2005, a Tuesday.  It is Ms. Lajko's testimony that at this meeting she told Dr. Greenspan she was extremely concerned about Plaintiff seeing that she was, at the time, pregnant with twins.  Ms. Lajko cautioned Greenspan, "You're going to stress her." [Lajko Dep., pp. 113-114].  (At this same meeting, Ms. Lajko related to Dr. Greenspan complaints about Plaintiff's behavioral outbursts and the problems she was causing in the office.)  It was after Lajko's meeting with Dr. Greenspan that Greenspan decided to fire Plaintiff. [LeBlanc Dep., pp. 72, 73]. Plaintiff was fired on May 13, 2005, the Friday of the same week during which Ms. Lajko spoke to Dr. Greenspan.

Then, the day after Plaintiff was fired, Saturday, May 14, Ms. Lajko led an office meeting.  At this meeting, Ms. Lajko described her experienced with her own twin-pregnancy, and subsequently announced to a room full of 30 people that Plaintiff's employment had been terminated, explaining that because Plaintiff was pregnant "she need[s] to relax, and we all need to support her in that. . . ." [Lajko Dep., p. 53]. Mr. LeBlanc disputes this.  According to LeBlanc, Ms. Lajko "did not say that Laura was being laid off so that she wouldn't be stressed and therefore won't have an effect on her pregnancy. . . .  If I had heard that, I would have been on my feet and I would have corrected that in a heartbeat." [LeBlanc Dep., p. 80].

16

Ms. Amy Mello, an employee who was also present at the Friday meeting, was later recorded by Plaintiff during a telephone conversation discussing the meeting. Ms. Mello, in response to Plaintiff's question whether Ms. Lajko had said anything about being fired because of her pregnancy, stated:

> Yeah, she said, she said out right, you know. "I'd gone to Dr. Greenspan a couple of weeks ago." Laura, she's like "I didn't do this to try to hurt Laura. I didn't do this for any reason like that." She said, "I had…," this was the way she put it to us you know. "I had twins. I was like her working, you know, working like crazy, stressful and all that kind of stuff. And umm, you know I went into labor way early and had to leave my babies in the hospital for three months." And she's like, "I do not want that to happen to Laura. It's not worth it and you know. . . ."

[Mello Dep., Plaintiff's Ex. M (some internal punctuation added for clarification)].[9] Another employee, Jessica Golemba confirmed Ms. Mello's version of what was said at the Friday meeting in another recorded phone call. [Golemba Dep., p. 85].[10]

Plaintiff contends that Karen Lajko's statements to Dr. Greenspan and at the staff meeting constitute "direct evidence" of pregnancy discrimination. Defendants counter that Lajko's statements cannot constitute direct evidence of discrimination because Ms. Lajko did not make the decision to lay Plaintiff off nor did she have authority to speak for the Medical Practice with regard to the reasons Ms. Huck was terminated. *See* Greenspan Affidavit.

---

[9]  The tape recording of the telephone conversation was played at Ms. Mello's deposition and she confirmed that the recording was of her speaking to Plaintiff. She also confirmed what she had said in the phone conversation.

[10]  Golemba also authenticated the tape recording of her phone conversation with Plaintiff.

Defendants are correct.  Ms. Lajko's comments do not constitute direct evidence of discrimination. "Evidence either of statements made by non-decision makers or of statements made by decision-makers that are not related to the decisional process itself do not satisfy the plaintiff's burden of demonstrating direct evidence of discriminatory animus." *Birch v. Cuyahoga County Probate Court*, 392 F.3d 151, 165 (6th Cir. 2004) (citations omitted); *Wells v. New Cherokee Corp.*, 58 F.3d 233, 238 (6th Cir. 1995) (intermediate level supervisor must have been "meaningfully involved" in the decisional process for his remarks to constitute direct evidence of discrimination); *see also Carter v. University of Toledo*, 349 F.3d 269 (6th Cir. 2003) (holding that a non-decisionmaker's statements that the college of education consisted of  "a bunch of racists" and that the dean of the college of education was "trying to whitewash the faculty," even if admissible as non-hearsay, did not constitute direct evidence of racial discrimination because "comments made by individuals who are not involved in the decision-making process regarding the plaintiff's employment do not constitute direct evidence of discrimination." 349 F.3d at 273 (citing *Hopson v. DaimlerChrysler Corp.*, 306 F.3d 427, 433 (6th Cir. 2002))

Here, Ms. Lajko was not a decision-maker.  She was the sales and marketing director of the occupational medicine division of the Medical Practice.  She was not Plaintiff's supervisor.  She had no ability to hire or fire Plaintiff or any authority to make hiring or firing recommendations.  Though Lajko went to Dr. Greenspan to express her concerns about Plaintiff "causing chaos" in the office and being "stressed" during her

18

pregnancy, it is undisputed that she did not make the decision to fire her and there is no evidence that she suggested or recommended that Plaintiff be fired.   Her remarks to the assembled group of employees, therefore, do not constitute direct evidence of discrimination.[11]

Plaintiff also appears to suggest that the remarks of Karen Lajko may be attributed to her employer as an "adoptive admission" by virtue of the presence of Defendant LeBlanc at the meeting when the remarks were made and his not having rebutted or disputed the statements.   Plaintiff further posits that because LeBlanc was a participant in the decision-making process concerning Plaintiff's firing, this "adoptive admission"

---

[11]   Plaintiff also attempts to use her transcripts of recorded phone conversations with other employees who were at the meeting where Ms. Lajko spoke to bolster the assertion that Ms. Lajko's comments constituted direct evidence that Plaintiff was fired for discriminatory reasons. These transcriptions present multiple levels of hearsay, and as indicated above, inadmissible hearsay evidence cannot be considered on summary judgment. *Jacklyn, supra.* However, at the summary judgment stage, the focus is not on the admissibility of the evidence's form. *See DeBiasi v. Charter County of Wayne*, 537 F. Supp. 903, 911-12 (E.D. Mich. 2008) (citing *Celotex v. Cattrett, supra*, 477 U.S. at 324; 105 S.Ct. at 2553 (explaining that in requiring the nonmoving party to produce evidence to withstand a motion for summary judgment, "[w]e do not mean that the nonmoving party must produce evidence in a form that would be admissible at trial")); *see also Fraser v. Goodale*, 342 F.3d 1032, 1036 (9th Cir. 2003), *cert. denied*, 541 U.S. 937 (2004) ("At the summary judgment stage we do not focus on the admissibility of the evidence's form.") Instead, the determining factor is whether the evidence is capable of being converted to non-hearsay evidence at trial. *DeBiasi, supra,* and cases cited therein. Thus, assuming *arguendo* that Plaintiff could present the co-worker statements through direct testimony, (i.e., in a form that would be admissible at trial), the Court may consider the evidence here.

Nonetheless, as noted, all that Plaintiff's co-workers told her in the tape recorded phone conversations was what Karen Lajko said at the staff meeting and as indicated, because Karen Lajko was not a decision-maker, her statements to the other employees at the staff meeting as to the reason Plaintiff's employment was terminated do not constitute direct evidence of discrimination.

constitutes direct evidence of discrimination on the Medical Practice's part.

The Sixth Circuit has discussed adoptive admissions as follows:

Fed. R. Evid. 801(d)(2)(B) permits a court to allow into evidence a statement as non-hearsay if "[t]he statement is offered against a party and is . . . a statement of which the party has manifested an adoption or belief in its truth." Adoption can be manifested by any appropriate means, such as language, conduct, or silence. . . . If the statements are viewed as the defendant's own, they constitute admissions properly characterized as non-hearsay under Fed. R. Enid. 801(d)(2).

When a statement is offered as an adoptive admission, the primary inquiry is whether the statement was such that, under the circumstances, an innocent defendant would normally be induced to respond, and whether there are sufficient foundational facts from which the jury could infer that the defendant heard, understood, and acquiesced in the statement.

*United States v. Jinadu*, 98 F.3d 239, 244 (6th Cir.1996), *cert. denied*, 520 U.S. 1179 (1997).

Thus, the burden is upon the proponent of the statement -- here, the Plaintiff -- to show that the party heard the statement, *United States v. Diaz*, 936 F.2d 786, 788-89 (5th Cir. 1991); understood the statement, *Riccardi v. Childrens Hosp. Med. Center*, 811 F.2d 18, 24 (1st Cir. 1987); was able to respond to the statement, *United States v. Fortes*, 619 F.2d 108, 116-17 (1st Cir. 1980); and had the motive and opportunity to respond -- i.e., the statement was made under circumstances reasonably calling for an answer. *Southern Stone Co., Inc. v. Singer*, 665 F.2d 698, 703 (5th Cir. 1982); *United States v. Moor*e, 522 F.2d 1068, 1976 (9th Cir. 1975), *cert. denied*, 423 U.S. 1049 (1976). Plaintiff cannot meet this burden here.

Defendant LeBlanc testified at his deposition that he did not hear Karen Lajko's

remark about Plaintiff needing to be off work so that she would not be stressed during her pregnancy.  LeBlanc further testified that had he heard the statement, he would have protested.  Plaintiff has not come forward with any evidence contradicting LeBlanc's testimony or from which it might be inferred that LeBlanc did, in fact, hear Lajko's remark.  It is fundamental that the proponent of an adoptive admission establish that the party *heard* the statement.  *United States v. Diaz, supra; United States v. Jinadu, supra* (there must be sufficient foundational facts from which the jury could infer that the defendant heard, understood, and acquiesced in the statement).  Plaintiff having failed to come forward with evidence showing that Defendant LeBlanc heard Karen Lajko's statement, the statement cannot be deemed to have been adopted by LeBlanc -- or by Dr. Greenspan and the Practice -- by virtue of his silence and, accordingly, cannot be deemed to constitute "direct evidence" of discrimination.

Plaintiff also contends that the temporal proximity of Ms. Lajko's meeting with Dr. Greenspan and Mr. LeBlanc and Plaintiff's firing three days later constitutes direct evidence of discrimination.  Plaintiff is mistaken. Timing alone does not constitute direct evidence, because one would have to *infer* that Dr. Greenspan used the information provided by Lajko about her concerns about Plaintiff's pregnancy in deciding to fire her. "[D]irect evidence of discrimination does not require a factfinder to draw any inferences in order to conclude that the challenged employment action was motivated at least in part by prejudice against members of the protected group." *Johnson v. Kroger Co.*, 319 F.3d 858, 865 (6th Cir. 2003). Therefore, the temporal proximity of Ms. Lajko's meeting with

21

Dr. Greenspan and the decision to fire Ms. Huck does not constitute direct evidence of discrimination.

C.   PLAINTIFF HAS NOT OFFERED DIRECT EVIDENCE OF DISCRIMINATION, THEREFORE, THE *MCDONNELL DOUGLAS* BURDEN SHIFTING PARADIGM APPLIES.

Because Plaintiff has failed to come forward with direct evidence of discrimination, she must prove her *prima facie* case under the *McDonnell Douglas* burden shifting paradigm.  Using the *McDonnell Douglas* paradigm, to establish a *prima facie* case of pregnancy discrimination, Plaintiff must show "(1) that she was pregnant; (2) that she was qualified for her job; (3) that she was subjected to an adverse employment decision; and (4) that there is a nexus between her pregnancy and the adverse employment decision." *Boyd*, 88 F.3d 410, 413 (6th Cir. 1996). If the plaintiff establishes a *prima facie* case, the burden of production shifts to the defendant to articulate a legitimate, nondiscriminatory reason for its actions. *Texas Dept. of Community Affairs v. Burdine*, 450 U.S. 248, 253 (1981). If the defendant satisfies this burden, the *McDonnell Douglas* presumption of intentional discrimination "drops out of the picture." *St. Mary's Honor Center v. Hicks*, 509 U.S. 502, 511, 113 S.Ct. 2742, 2749 (1993). The employee must then prove by a preponderance of the evidence that the defendant intentionally discriminated against her. She may satisfy this burden by showing that the legitimate reasons offered by the employer were not its true reasons, but were a pretext for intentional discrimination. *Id*.

Here, it is undisputed that the Plaintiff meets the first three *prima facie* factors.

Plaintiff was pregnant, satisfying the first factor. There is no dispute that she was qualified for her job, satisfying the second factor. There is some dispute over what actions qualify as an adverse employment decision, but for this analysis, it is enough that Plaintiff was fired to satisfy the element.  The controversy here concerns whether Plaintiff has established a nexus between her pregnancy and the adverse employment decision.

Plaintiff contends that there is an inference of illegal discrimination, and primarily bases her contention that she has established a *prima facie* case based upon the proximity of time between the meeting between Lajko and Dr. Greenspan and the decision to fire her.  Though Defendants state at page 14 of their brief that "Plaintiff cannot demonstrate either a nexus between her pregnancy and the alleged averse employment actions or that the Medical Practice's legitimate non-discriminatory explanations are pretexts for pregnancy discrimination," they make no legal argument whatsoever concerning the nexus requirement and, instead, focus almost exclusively on the Plaintiff's inability to prove pretext.

The Sixth Circuit Court has established a relatively low bar for establishing pregnancy discrimination in terms of laying the foundation of a *prima facie* case concerning a nexus between a pregnancy and an adverse employment decision.  In *Cline v. Catholic Diocese*, 206 F.3d 651, 660 (6th Cir. 2000), the court stated, "[t]he *prima facie* requirement for making a Title VII claim is not onerous, and poses a burden easily met." (citations omitted).

In *Asmo v. Keane, Inc.*, 471 F.3d 588 (6th Cir. 2006), the plaintiff worked as a

23

Selling, General, and Administrative (SG&A) Recruiter for Keane, Inc., an information technology and business consulting firm. On September 11, 2001, Asmo learned she was pregnant with twins. Sometime in October 2001, Asmo informed the entire SG&A team of the pregnancy during a conference call. Asmo testified that all of the SG&A recruiters congratulated her, except for Scott Santoro, Director of Corporate Recruiting, who remained silent during the congratulations and then moved quickly change the conversation back to business matters.  Two months later, on December 4, 2001, Santoro informed Asmo that she was being laid off.  Asmo testified that Santoro said "your expenses are a lot more expensive than the other recruiters."  Later, it was Santoro's testimony that expenses played no role in his decision.

The *Asmo* court cited *DiCarlo v. Potter*, 358 F.3d 408, 421 (6th Cir. 2004), a retaliation case, for the proposition that "[t]emporal proximity can establish a causal connection between the protected activity and the unlawful employment action in the retaliation context."  In *DiCarlo*, the court stated that "this Circuit has embraced the premise that in certain distinct cases where the temporal proximity between the protected activity and the adverse employment action is acutely near in time, that close proximity is deemed indirect evidence such as to permit an inference of retaliation to arise."  *Id.* Additionally the court cited *Nguyen v. City of Cleveland*, 229 F.3d 559, 567 (6th Cir. 2000), and noted "there may be circumstances where evidence of temporal proximity alone would be sufficient to support that inference" of a causal nexus.

The *Asmo* court also relied on *Prebilich-Holland v. Gaylord Entm't Co.*, 297 F.3d

24

438, 444 (6th Cir. 2002), and commented that "temporal proximity can also satisfy the nexus requirement in the pregnancy discrimination context." *Id.*  Based upon the forgoing authorities, in *Asmo*, the Court found the two-month period between the time Santoro learned that Asmo was pregnant and the date on which he fired her, was enough to establish a nexus sufficient to establish the fourth prong of the *prima facie* case for pregnancy discrimination.

To be sure, in determining whether there is enough of a nexus to establish a *prima facie* case of pregnancy discrimination, the case law on the relationship between the proximity of time and the adverse employment decision, is muddled and uncertain. The court in *Nguyen* found that temporal proximity alone is generally insufficient to raise an inference of retaliation, even though the court in *Asmo* used *Nguyen* to suggest that there is support for the suggestion that temporal proximity would support a causal nexus in a pregnancy discrimination case.

Moreover, *DiCarlo* set out a narrow rule where temporal proximity would be enough to establish a nexus. The *DiCarlo* court stated, "in *certain distinct* cases where temporal proximity between the protected activity and the adverse employment action is *acutely near in time*, that close proximity is deemed indirect evidence such as to permit an inference of retaliation to arise." *DiCarlo,* 358 F.3d at 421.

From the Court's own research, it appears that *Asmo* is the first case to adopt the principles relating to a claim of nexus in the retaliation context and apply them to a claim of pregnancy discrimination, particularly the notion that temporal proximity alone can

25

satisfy the requirement of a nexus between the adverse employment decision and the

protected activity.  Operating under the principle that a pregnancy discrimination claim is

to be analyzed under the same frame-work as a retaliation claim, it is necessary to

examine the length of time between the adverse employment action and the notice of

pregnancy here so as to determine whether a sufficient nexus is established to satisfy the

*prima facie* case for discrimination.

The Court in *Leininger v. Reliastar Life Ins. Co.*, 2007 WL 2875283 (E.D. Mich.

2007) noted "[a]lthough temporal proximity alone can suffice to establish the retaliatory

intent, "[t]he cases that accept mere temporal proximity between an employer's

knowledge of protected activity and an adverse employment action as sufficient evidence

of causality to establish a prima facie case uniformly held that the temporal proximity

must be 'very close.'" (citing *Clark County Sch. Dist. v. Breeden*, 532 U.S. 268, 273, 121

S.Ct. 1508 (2001).

The Court in *Nguyen* noted "previous cases that have permitted a *prima facie* case

to be made based on the proximity of time have all been short periods of time, usually

less than six months." *Id at* 567.  However, as recognized by *Eppes v. Enterprise Rent-A-*

*Car Co. of Tennessee,* 2007 WL 1170741 (E.D.Tenn. 2007), the court in *Cooper v. City*

*of North Olmsted*, 795 F.2d 1265, 1272 (6th Cir.1986), held that a temporal nexus of four

months was insufficient to raise an inference of retaliation. However, when the temporal

nexus was only 21 days, the Sixth Circuit found that temporal proximity alone was

sufficient to establish an inference of retaliation.  *See DiCarlo, supra*. In *Singfield v.*

*Akron Metro. Hous. Auth.*, 389 F.3d 555, 563 (6th Cir.2004), the court held that temporal proximity of three months was sufficient to establish an inference of retaliation. As previously mentioned, the Court in *Asmo* found that a temporal proximity of two months was sufficient to establish a link between the protected activity and termination for the purposes of setting forth a Title VII *prima facie* claim of discrimination.

It is apparent that in order for temporal proximity alone to satisfy the nexus requirement the period of time must be shorter than six months, although the court in *Cooper* held that four months is insufficient to establish a *prima facie* case of discrimination. The grey area, thus, appears to lie in between three months and sixth months, which is exactly where the instant action falls.  Plaintiff told Dr. Greenspan she was pregnant on February 8, 2005, and was ultimately fired on May 13, 2005, a period of just over three months.  Furthermore, Plaintiff's pregnancy was discussed by Dr. Greenspan and Mr. LeBlanc -- the decisionmakers with regard to Plaintiff's termination -- less than a week before Plaintiff was terminated, in the same meeting where the firing decision was made.  In light of the above-discussed case law and the premise that a *prima facie* case should not be difficult to make out, the Court finds that Plaintiff here has established that a causal nexus exists, and, therefore, has established a *prima facie* case of pregnancy discrimination.

D.    DEFENDANTS HAVE ARTICULATED A LEGITIMATE, NON-
      DISCRIMINATORY REASON FOR FIRING PLAINTIFF.

Having concluded that Plaintiff has made out a *prima facie* case, the Court turns to

27

the question of whether Defendants have articulated a legitimate, non-discriminatory

reason for deciding to terminate Laura Huck on May 13, 2005.  Defendants' burden is

one only of production, not of persuasion. *Texas Dep't of Community Affairs v. Burdine,*

450 U.S. 248, 254-56, 101 S. Ct. 1089, 1094-95 (1981); *St. Mary's Honor Ctr. Hicks*, 509

U.S. 502, 507-508, 113 S.Ct 2742, 2747-48 (1993); *Reeves v. Sanderson Plumbing*

*Products, Inc.,* 530 U.S. 113, 142, 120 S.Ct. 2097, 2106 (2000). The Court finds that the

Defendants have satisfied their burden in this regard.  Defendants' proffered reason for

firing plaintiff was to reduce the number of employees at the Medical Practice in an effort

to cut costs. Additionally, Defendants assert that Plaintiff was selected for the RIF

"because of the behavior [of Huck] that others were reporting to [Greenspan] and because

[Greenspan] believed that strife in the Wixom office was being fueled by her conduct."

[*See* Greenspan Affidavit.]

E.      PLAINTIFF HAS FAILED TO ESTABLISH THAT DEFENDANTS'
        PROFFERED REASON FOR FIRING PLAINTIFF WAS PRETEXT FOR
        A DISCRIMINATORY ANIMUS.

        Because Defendants have satisfied their burden of production by offering a non-

discriminatory reason for firing Plaintiff, the burden shifts back to the Plaintiff to

establish by a preponderance of the evidence that the Defendants' proffered reason is a

pretext for intentional discrimination. *E.E.O.C. v. Avery Dennison Corp.*, 104 F.3d 858,

862 (6th Cir. 1997) (citing *Burdine*, 450 U.S. at 252-53, 101 S.Ct. at 1093).

        To make a submissible case on the credibility of the employer's explanation, the

plaintiff is required to show by a preponderance of the evidence either (1) that the

28

proffered reasons had no basis in fact, (2) that the proffered reasons did not actually

motivate her discharge, or (3) that they were insufficient to motivate the discharge.

*Manzer v. Diamond Shamrock Chem. Co.*, 29 F.3d 1078, 1084 (6th Cir. 1994); *see also*

*Gray v. Toshiba Am. Consumer Prod.*, 263 F.3d 595, 600 (6th Cir. 2001).

A showing that a proffered reason had "no basis in fact" consists of evidence

establishing that the proffered reasons for the employer's decision never happened, or are

factually false. *Manzer*, 29 F.3d at 1084. To make a showing that the proffered reasons

"did not actually motivate the employer's conduct," the plaintiff must present evidence

"which tend[s] to prove that an illegal motivation was more likely than that offered by the

defendant." *Id*. Finally, a showing that the proffered reasons were "insufficient to

motivate the employer" consists of evidence that other employees, particularly employees

not in the protected class, were not treated the same way, even though they engaged in

substantially identical conduct. *Manzer*, 29 F.3d at 1084.

According to the *Manzer* court, the first and third types of rebuttals -- that the

reason offered by the employer has no basis in fact or was insufficient to warrant the

employer's decision -- "are direct attacks on the credibility of the employer's proffered

motivation for firing the plaintiff, and if shown, provide an evidentiary basis for what the

Supreme Court has termed a 'suspicion of mendacity,' " sufficient to withstand summary

judgment. *Id*.[12]  As for the second *Manzer* option -- that the employer's articulated reason

--------

[12]  Michigan's law regarding pretext law differs from federal law in this regard in that it
requires in all instances "pretext plus." Under Michigan law, "disproof of an employer's
articulated reason for an adverse employment decision defeats summary disposition only

did not actually motivate the employer's actions -- the Sixth Circuit has held

> If the bare bones elements of plaintiff's prima facie case were sufficient to
> make this showing, ... the entire "burden shifting" analysis of *McDonnell*
> *Douglas* and its successors would be illusory.... Accordingly, we hold that,
> ***in order to make this type of rebuttal showing, the plaintiff may not rely***
> ***simply upon his prima facie evidence, but must, instead, introduce***
> ***additional evidence of [prohibited] discrimination.***

*Gray v. Toshiba Am. Consumer Prods*., supra, 263 F.3d at 600 (quoting *Manzer*, 29 F.3d

at 1084) (emphasis added).

Regardless of which rebuttal method is employed, the plaintiff retains the ultimate

burden of producing "sufficient evidence from which the jury could reasonably reject [the

defendant's] explanation and infer that the defendant intentionally discriminated against

him." *Johnson v. Kroger Co., supra*, 319 F.3d at 866.

Plaintiff in this case challenges as pretext Defendants' stated reason that she was

laid off to reduce the number of employees at the Medical Practice in order to lower the

Practice's expense ratio.  Additionally, Plaintiff challenge as pretext the Defendants'

assertion that Plaintiff was selected for "reduction because of the behavior that others

were reporting to Dr. Greenspan and because he [Greenspan] believed that strife in the

--------

if such proof also raises a triable issue that discriminatory animus was a motivating factor
underlying the employer's adverse action. In other words, plaintiff must not merely raise
a triable issue that the employer's proffered reason was pretextual, but that it was a
pretext for…discrimination. Therefore,…in the context of summary disposition, a
plaintiff must prove discrimination with admissible evidence, either direct or
circumstantial, sufficient to permit a reasonable trier of  fact to conclude that
discrimination was a motivating factor for the adverse action taken by the employer
toward the plaintiff. *Malady v. Lytle,* 458 Mich. 153, 579 N.W.2d 906, 916
(1998)(footnotes omitted); *see also Town v. Michigan Bell Telephone Co.*, 455 Mich.
688, 568 N.W. 2d 65, 68-69 (1997).

Wixom office was being fueled by her conduct."

Plaintiff alleges that "[d]efendant's frequently fluctuating, uncredible [sic] reasons, especially in light of timing and direct evidence in this case, clearly raise an issue of pretext." Plaintiff's brief at 27. "An employer's changing rationale for making an adverse employment decision can be evidence of pretext." *Thurman v. Yellow Freight Sys., Inc.,* 90 F.3d 1160, 1167 (6th Cir.), *amended on other grounds*, 97 F.3d 833 (6th Cir. 1996). However, contrary to Plaintiff's allegations, the Court finds that Defendants have maintained a consistent rationale for firing Plaintiff, and that Plaintiff has failed to provide a basis sufficient to satisfy her burden in proving that Defendants' stated reasons for firing her were pretextual.

Plaintiff alleges that "[d]espite spending a lot of time chastising Plaintiff's job performance in their motion, Defendants conceded that Plaintiff's performance, including the allegations of disruptiveness, would not have justified her termination." In Mark LeBlanc's deposition, Mr. LeBlanc acknowledged that Plaintiff's performance issue *alone* was not the reason that she was laid off. *See* LeBlanc Dep. at 86. However, Defendants do not argue that her layoff was needed only because of Plaintiff's outbursts. Instead, Defendants assert that an effort to reduce costs and expenses drove the layoff, and Plaintiff was selected for the RIF because her outbursts and her duplicative position (with that of Theresa Duncan) made her vulnerable.

Dr. Greenspan testified,

We were losing money in that the extent that the expense ratio versus what

31

> we were taking in was way too high. An office practice shouldn't have as
> high expenses as we had. There was too much money being spent on
> supplies, personnel, and people standing around, just as Laura had testified
> in her deposition. So the expense ratio is what you look at when you are
> assessing a practice in terms of its viability.

[Greenspan Dep. at 102.]

Indeed, Dr. Greenspan's comment in his deposition reflects what Plaintiff had

previously written in her personal notes that Dr. Greenspan was concerned with too many

people standing around.

Mark LeBlanc testified,

> One method that I use for practice management is I seek constant
> improvement.  Particularly with respect to the performance of the business
> as it relates to the revenue stream, the expense outflow. Regardless of
> whether the practice is doing great or doing poorly, I will always seek to
> reduce expenses if I can do so without affecting revenue, and if I can do so
> without affecting the quality of the care and the satisfaction that is delivered
> to the patients.

[LeBlanc Dep. at 42.]

Regarding the particular choice of Plaintiff for layoff instead of Theresa Duncan,

LeBlanc testified,

> I felt from a standpoint of experience and professionalism, the ability to
> control emotions, that Theresa had better abilities in those areas. And I also
> felt that Theresa had a better ability to motivate employees to do things that
> were positive.

[LeBlanc Dep. at 45.]

Finally, Plaintiff argues that the billing position that Defendants claim Plaintiff

asked for in February of 2005 was available in May of 2005.  While it is true that

Defendants hired at least one employee in the months of May, August, October, and

December of 2005,[13] Plaintiff has presented no evidence as to what particular positions

were filled.  Neither is there any evidence of record -- other than the Plaintiff's bare

allegations -- that the position Plaintiff claims to have sought in February of 2005 was

still available in May of 2005.

In sum, Plaintiff's assertion that Defendants have continually changed their story

regarding the motivations for firing Huck is simply not supported by the record. Plaintiff

has failed to show (1) that the proffered reasons for her discharge had no basis in fact, (2)

that the proffered reasons did not actually motivate her discharge, or (3) that they were

insufficient to motivate the discharge.  The Court, therefore, finds that Plaintiff has not

met her burden in proving that Defendants' proffered reasons for laying her off were

merely pretext for a pregnancy-based discriminatory animus. Plaintiff's Title VII and

ELCRA pregnancy discrimination claims, accordingly, will be dismissed.[14]

---

[13]  Plaintiff merely cites Defendants' Responses to Requests to Admit in which
Defendants admitted that the Practice "hired one or more employee in August,
...September,...October,...[and] November of 2005." [*See* Defendants' Responses to
Request to Admit, Plaintiff's Ex. R.]

[14]  The Court's decision dismissing Plaintiff's discrimination claims makes it unnecessary
for the Court to address Defendants' separate argument that Mark LeBlanc should not be
held liable on Plaintiff's ELCRA claims because he was not Plaintiff's employer nor an
"agent" of the employer because he was not delegated supervisory authority and did not
have the authority to hire, fire or discipline employees.  However, the Court notes that
Defendants' assertions are not supported by the record.  In fact, Dr. Greenspan testified in
his deposition that he left LeBlanc in charge of the office for the several months that was
recovering from his heart attack and that LeBlanc handled management of the office, and
that he [Greenspan] left it entirely up to LeBlanc "and his expertise" to lay off Plaintiff.
[Greenspan Dep., pp. 49, 51, 131.]  He cannot now contradict that testimony with an
after-the-fact affidavit and claim that LeBlanc was not his agent.  *See Reid v. Sears,*

33

F.     PLAINTIFF HAS FAILED TO ESTABLISH A *PRIMA FACIE* CASE OF
       RETALIATION OR THAT THE MEDICAL PRACTICE'S
       EXPLANATION IS A PRETEXT FOR RETALIATION.

       To establish a *prima facie* case of unlawful retaliation Plaintiff must show: (1) that

she engaged in a protected activity; (2) that this was known by the Defendants; (3) that

Defendants took an adverse employment action against Plaintiff; and (4) that there was a

causal connection between the protected activity and the adverse employment action.

*DeFlaviis v. Lord & Taylor, Inc,* 223 Mich. App. 432, 436, 566 N.W. 2d 661 (1997)

(ELCRA); *Niswander v. Cincinnati Ins. Co.*, 529 F.3d 714, 720 (6th Cir. 2008) (Title

VII).   In claiming retaliation in violation of Title VII and ELCRA, Plaintiff asserts that

she complained about illegal harassment and discrimination to Defendant Greenspan on

February 8, 2005, and Human Resource Director Christine Hiipakka on February 11,

2005.  However in her deposition concerning the meeting with Dr. Greenspan on

February 8, 2005, Plaintiff never testified about complaining of illegal harassment or

discrimination to either of these individuals.

       At no time during her deposition did Plaintiff say that she complained to Dr.

Greenspan about illegal harassment and discrimination during that meeting on February

8, 2005. Plaintiff said only that they had a conversation about her being pregnant and Dr.

Greenspan congratulated her.  *See* Plaintiff's Dep. at 311.  Additionally, Plaintiff

described how she was upset at the way Dr. Greenspan was handling the dispute between

her and Theresa Duncan, and how Dr. Greenspan told her duties would be changing. *Id.*

_____

*Roebuck & Co.,* 790 F.2d 453, 460 (6th Cir. 1986) .

at 312-13.  In response to defense counsel's question, "Did you make any request of him at this meeting with regard to your job?"  Plaintiff answered that she asked Dr. Greenspan to help her and Theresa's working relationship. *Id.* at 314.  Again, when defense counsel asked her, "Did you make any other requests to him about your job, did you ask him for any other things to help, change or do anything?" Plaintiff responded, "I just wanted help with Theresa." *Id.* at 315.  Indeed, Plaintiff had plenty of opportunities to state that she complained to Dr. Greenspan of her perceived illegal discrimination and harassment, but failed to do so.

 Plaintiff also alleges that she also complained to Christine Hiipakka, Human Resource Director, about illegal harassment and discrimination on February 11, 2005.  In her January 2008 affidavit Plaintiff states, "On February 11, 2005, I lodged a complaint of illegal harassment and discrimination, based on pregnancy and protected FMLA activity with Defendants Greenspans' Human Resource Director, Christine Hiipakka." However, no such complaint was ever mentioned in her deposition. The only reference to Plaintiff complaining of discrimination to Christy Hiipakka is in her post-deposition/post-summary judgment motion affidavit.

During Plaintiff's deposition, Defendants' counsel asked Plaintiff about her meetings and discussions with Ms. Hiipakka and specifically asked, "[W]hat did you tell her?" [Plaintiff's Dep., p. 342.]  Plaintiff responded, "I called and had a conversation with Kristy that I was upset, I felt like I was being badgered, I felt like I was being mistreated." *Id.*  She never said, however, that such alleged badgering or mistreatment was based on

35

her sex or her pregnancy or that she made any complaint of sex or pregnancy discrimination to anyone at the Practice.[15]

In evaluating Plaintiff's *prima facie* case, it is necessary to examine each element to determine whether Plaintiff has met her burden of production. With regard to the first *prima facie* retaliation element, "engaging in protected activity," Plaintiff has failed to meet her burden. The protected activity in this case would be Plaintiff complaining to Hiipakka and/or Dr. Greenspan of illegal harassment and discrimination.  However, there is no admissible evidence of record -- other than Plaintiff's post-deposition affidavit prepared long after her deposition and *after* Defendants filed their Motion for Summary Judgment in which Defendants pointed out the absence of evidentiary support for her retaliation allegations -- that Plaintiff ever complained to either Hiipakka or Dr. Greenspan of sexual or pregnancy discrimination or mistreatment.[16]  Because Plaintiff has

_____

[15]  That Plaintiff never mentioned sex or pregnancy related harassment or discrimination when she complained to Christy Hiipakka is further borne out by other evidence Plaintiff herself has proffered in opposing Defendants' summary judgment motion.  Plaintiff's Exhibit L consists of Christy Hiipakka's summary memo of her 2/11/05 conversation with Plaintiff.  According to Ms. Hiipakka's summary with regard to Ms. Huck's complaints of mistreatment, Ms. Huck stated only "that she felt harassed and pushed around by Dr. Greenspan." [Plaintiff's Ex. L.] No allegation of sexual or pregnancy discrimination or harassment is noted.

[16]  A party may not create a factual issue by filing an affidavit, after a motion for summary judgment has been made, which contradicts her earlier deposition testimony. *See Reid v. Sears, Roebuck & Co., supra,* 790 F.2d at 463; *see also Aerel S.R.L. v. PCC Airfoils, L.L.C.*, 448 F.3d 899, 908 (6th Cir. 2006) (district court may disregard post summary judgment affidavit if it directly contradicts the non-moving party's prior sworn testimony or, if not directly contradictory, the court determines that the affidavit "constitutes an attempt to create a sham fact issue." (quoting *Franks v. Nimmo*, 796 F.2d 1230, 1237 (10th Cir.1986)).

failed to satisfy the first element of retaliation, she has failed to make out a *prima facie* case of retaliation.

However, even assuming arguendo, that Plaintiff has met her burden regarding a *prima facie* case of retaliation, Plaintiff's retaliation claims under Title VII and the ELCRA still must fail because they are subject to the same burden shifting analysis as claims of discrimination. *Aho v. Department of Corrections,* 263 Mich. App. 281, 688 N.W. 2d 104 (2004); *Williams v. Nashville Network*, 132 F.3d 1123, 1131 (6th Cir. 1997). Because the Defendants have articulated a legitimate, non-retaliatory reason for their decision, the burden shifts to the Plaintiff to prove that the articulation is merely pretext for a discriminatory animus. As discussed above, Plaintiff has failed to meet her burden in this regard. Therefore, Plaintiff's claims of retaliation will be dismissed.

G.    PLAINTIFF HAS FAILED TO ESTABLISH THAT THE DEFENDANTS
      ENGAGED IN A CONSPIRACY TO VIOLATE PLAINTIFF'S RIGHTS

Plaintiff also claims that the Defendants conspired to violate her rights under ELCRA. The ELCRA states that "[t]wo or more persons shall not  conspire to … retaliate or discriminate against a person." M.C.L. §37.2701. A conspiracy "is a combination of two or more persons, by some concerted action, to accomplish a criminal or unlawful purpose, or to accomplish a lawful purpose by criminal or unlawful means." *Admiral Ins. v.  Columbia Casualty Ins.,* 194 Mich. App. 300, 313, 486 N.W. 2d 351 (1992), *app. denied*, 442 Mich. 917 (1993); *Feaheny v. Caldwell,* 175 Mich. App. 291, 307, 437 N.W. 2d 358 (1989).

Plaintiff here has presented no evidence of a concerted action to discriminate or retaliate against her. Plaintiff rests on the belief that the Defendants Greenspan and LeBlanc aided and abetted each other in violation of ELCRA. However, there can be no conspiracy to commit an illegal act where there is no showing of an illegal act. *See Admiral, supra* at 313, 486 N.W. 2d 351. Here, there has been no showing that any Defendant has committed an illegal act. Therefore, Plaintiff's conspiracy claim must be dismissed as a matter of law.

H.     PLAINTIFF HAS FAILED TO ESTABLISH THAT SHE WAS SUBJECTED TO COMMUNICATIONS OR CONDUCT ON THE BASIS OF PREGNANCY SO PERVASIVE AND SEVERE AS TO CONSTITUTE A HOSTILE WORK ENVIRONMENT.

Plaintiff next claims that she was subjected to a hostile work environment on the basis of her pregnancy in violation of Title VII and ELCRA.

To made out a *prima facie* claim of a sexually hostile work environment under Title VII, a plaintiff must allege and demonstrate (1) that she was a member of a protected class; (2) that she was subjected to unwelcome harassment; (3) that the harassment complained of was based on her sex; (4) that the harassment had the effect of unreasonably interfering with Plaintiff's work performance and was sufficiently severe or pervasive to create a hostile or offensive work environment; and (5) that the employer knew or should have known of the charged sexual harassment and failed unreasonably to take prompt and appropriate corrective action. *See Fenton v. HiSAN, Inc*, 174 F.3d 827,

38

829-30 (6th Cir. 1999).[17]

Here, Plaintiff asserts that she was given the "silent treatment" and claims, without any legal support whatsoever, that silence and isolation can be humiliating and abusive conduct that creates a hostile work environment.  Plaintiff, however, has made no showing that the "silence and isolation" was based on her sex or pregnancy.  Bare allegations will not suffice.  Plaintiff claims that the silence and isolation was noticeable by Plaintiff's co-workers.  However, Plaintiff must show that any communication or conduct was "based on sex" and was "sufficiently severe or pervasive to alter the conditions of the victim's employment and create an abusive working environment." *Harris v. Forklift Sys, Inc,* 510 U.S. 17, 21, 114 S.Ct. 367 (1993).  Plaintiff has not met this burden.  Therefore, Plaintiff has failed to make out a *prima facie* case of a hostile work environment claim, and her hostile work environment claims, accordingly, must be dismissed as a matter of law.

_____

[17]  The same elements are required to make out a *prima facie* claim under the Michigan Elliot-Larsen Act. Under the Michigan Act, it must be shown that:

(1) the employee belonged to a protected group;
(2) the employee was subjected to communication or conduct on the basis of sex;
(3) the employee was subjected to unwelcome sexual conduct or communication;
(4) the unwelcome sexual conduct or communication was intended to or in fact did substantially interfere with the employee's employment or created an intimidating, hostile, or offensive work environment; and
(5) respondeat superior.

*Chambers v. Trettco, Inc.,* 463 Mich. 297, 311, 614 N.W. 2d 910, 915 (2000) (quoting, *Radtke v. Everett,* 442 Mich. 368, 382-3, 501 N.W. 2d 155, 162 (1993)).

39

I.      PLAINTIFF'S FMLA CLAIMS

1.      DEFENDANT LEBLANC'S ELIGIBILITY AS AN "EMPLOYER"
        UNDER THE FAMILY MEDICAL LEAVE ACT

        With regard to Plaintiff's FMLA claims, Defendants first argue that Defendant

LeBlanc does not qualify as an "employer" under the statute because he did not have any

economic interest in the Defendant Medical Practice and because he had no supervisory

authority over Plaintiff.  The FMLA provides, in relevant part, that the term employer

includes "any person who acts, directly or indirectly, in the interest of an employer to any

of the employees of such employer." 29 U.S.C. § 2611(4)(A)(ii)(I).

        In *Stubl v. T.A. Sys. Inc.,* 984 F.Supp. 1075, 1084 (E.D. Mich.1997), this Court

held that the president and vice president of the defendant corporate employer were

subject to individual liability under the FMLA.  *Stubl*, 984 F.Supp. at 1082, 1085.  In

*Stubl*, the plaintiff alleged a violation of the FMLA by the defendants when, upon his

return from a medical leave, they deducted money from his paycheck for medical

insurance premiums paid during leave and terminated him allegedly for exercising his

FMLA rights.  *Id.* at 1078.  The Court reasoned that the individual defendants were acting

directly in the interest of the defendant company when they changed the terms of the

plaintiff's employment and terminated him and, therefore, could be liable under the Act.

*Id*. at 1085.

        In *Bryant v. Delbar Prod. Inc.*, 18 F. Supp. 2d. 799, 808 (M.D. Tenn. 1998),  the

court held that a supervisory employee was individually liable as an employer under the

FMLA -- even though he was not plaintiff's immediate supervisor -- because he had some supervisory power and communicated corporate personnel's termination decision to her. The *Bryant* court reasoned that because the defendant had the power to grant personal leave and excuse plaintiff from work on occasion, spoke with plaintiff regarding her absence, participated in a conference call with the individuals who approved her termination, and communicated corporate personnel's decision to terminate her, he was acting directly or indirectly in the defendant company's interest.  *Bryant,* 18 F.Supp.2d. at 808-809.

However, in *Freemon v. Foley*, 911 F. Supp 326, 331-332 (N.D. Ill. 1995), though the court held that plaintiff's immediate supervisor, that supervisor's supervisor, and the hospital's vice president of human resources qualified as employers under the FMLA, it determined that the plaintiff's "temporary" supervisor did not.  In *Freemon*, the plaintiff was terminated because of her unexcused absences and she was suspended until she provided the requisite information to excuse these absences.  When she failed to provide this information, the temporary supervisor communicated the defendants' decision to terminate her.  *Freemon*, 911 F. Supp. at 331.  The *Freemon* court reasoned that plaintiff's temporary supervisor did not exercise sufficient control over plaintiff's ability to take protected leave to qualify as an employer under the FMLA because he did not play any role in recommending or effectuating the plaintiff's termination; he merely communicated the decision to her. *Id.* at 331-332.

In this case, Defendant LeBlanc acted beyond his duties as legal counsel for the

Medical Practice.  Although he advised Dr. Greenspan on business and legal issues and assisted with the creation of company policies, *see* Greenspan Dep., p. 50; LeBlanc Dep., p. 89, during the period of Dr. Greenspan's recovery from his heart attack, LeBlanc exercised direct administrative and supervisory power in the place of Greenspan.

It is undisputed that during Defendant Greenspan's recovery, LeBlanc served as manager of the Practice. [Greenspan Dep., p. 49].  "[Greenspan] was off ill, [LeBlanc] met with us [Huck and Duncan], he was our liaison, **he was pretty much our [Greenspan] for the time being.**" [Plaintiff's Dep., p. 218].  "As far as I remember we just did the same thing we would with Dr. Greenspan, talked over problems and issues." *Id.*.  LeBlanc confirmed his managerial activities:

> I would typically start the day by meeting with [Huck] and [Duncan].  I would also talk with employees in the practice.  I would walk the facility to look for anything that appeared to be out of order or needed attention or needed–someone needed direction on something.  I would talk with the physicians with regard to things that were happening in the practice, what the patient service loads were.

[LeBlanc Dep., p. 28].

During Dr. Greenspan's absence, LeBlanc recommended to Greenspan that three staff members' contracts not be renewed -- Huck was one of these staff members. Defendant LeBlanc testified that he "made a recommendation to [Greenspan] that [Huck] be one of the individuals to be considered as part of a reduction in force." *Id.* at 37. Furthermore, during the meeting in which it was finally decided that Huck was going to be laid off, Dr. Greenspan asked LeBlanc for his assessment of the matter.  When asked

42

for his opinion, LeBlanc said "my recommendations from the beginning of the year remain the same." *Id.* at 72. Dr. Greenspan also stated in his deposition that "[Leblanc] assists me and [sic] -- a decision upon good business practices and what's appropriate in terms of numbers of people and so forth and that's how we ran the business." [Greenspan Dep., p. 101].

Defendant LeBlanc's role, thus, is distinguishable from that of the temporary supervisor in *Freemon* because LeBlanc admittedly did play a direct role in Plaintiff's termination. LeBlanc recommended Huck's termination to Greenspan on two separate occasions and, after the decision was ultimately made by Greenspan, it was LeBlanc who told Plaintiff she was fired. As Dr. Greenspan testified, "I left [Huck's layoff] up to [LeBlanc], his expertise; and since I still had my medical problems, I was still sick as a dog, it was not something that I was involved with." *Id.* at 131. While Greenspan may have been the ultimate decision maker, it is undeniable that LeBlanc played a large part in that decision.

Based on the foregoing, the Court finds that Mark LeBlanc's role in the Medical Practice during Dr. Greenspan's period of recuperation from his heart attack raises a presumption that LeBlanc was acting "directly or indirectly in the interest of" Greenspan and the Practice. While LeBlanc may not have been Huck's immediate supervisor or formal employer, his role at the Medical Practice persuades the Court that he was, at least, acting indirectly in the interest of Greenspan and the Medical Practice and as such qualifies as an employer under the FMLA. Accordingly, this aspect of Defendants'

43

motion for summary judgment will be denied.

2.      PLAINTIFF'S CLAIMS OF FMLA VIOLATION

The Sixth Circuit has recognized two distinct theories of recovery for violations of the FMLA: (1) the so-called "entitlement" or "interference" theory, stemming from 29 U.S.C. § 2615(a)(1), which provides that "[i]t shall be unlawful for any employer to interfere with, restrain, or deny the exercise or attempt to exercise, any right provided under [the FMLA]"; and (2) the "retaliation" or "discrimination" theory arising from 29 U.S.C. § 2615(a)(2), which states that "[i]t shall be unlawful for any employer to discharge or in any other manner discriminate against an individual for opposing any practice made unlawful by [the FMLA]." *Daugherty v. Sajar Plastics, Inc.*, 544 F.3d 696, 707 (6th Cir. 2008). With regard to this latter theory, "[a]n employer is prohibited is prohibited from discriminating against employees. . . who have used FMLA leave" and may not "use the taking of FMLA leave as a negative factor in employment actions." 29 C.F.R. § 825.220(c). This prohibition includes retaliatory discharge for taking leave. *Arban v. West Publishing Co.*, 345 F.3d 390, 403 (6th Cir. 2003). While an employer's intent is not directly relevant to the interference/entitlement theory, *see Edgar v. JAC Prods.*, 443 F.3d 501, 507 (6th Cir. 2006); *Hoge v. Honda of Am. Mfg., Inc.*, 384 F.3d 238, 244 (6th cir. 2004) ("an employer may violate § 2615(a)(1) regardless of the intent behind its conduct"), the employer's motive is an integral part of the retaliation/discrimination analysis "because retaliation claims impose liability on employers that act against employees specifically *because* those employees invoked their FMLA rights." *Edgar* at

44

508.

In this case, Plaintiff asserts both interference and retaliation claims.

a.    Plaintiff's Interference Claims

To prevail on an FMLA interference claim, the plaintiff must establish that the employer interfered with an FMLA right to medical leave or to reinstatement following FMLA leave.  *Arban, supra*, 345 F.3d at 401; *Hoge, supra*, 384 F.3d at 244; *Covin v. Honda of Am. Mfg., Inc.*, 346 F.3d 713, 719 (6th Cir. 2003).  Plaintiff must establish that (1) she was an eligible employee, (2) the Medical Practice was a covered employer, (3) she was entitled to leave under the FMLA, (4) she gave her employer notice of her intent to take leave, and (5) the employer denied her FMLA benefits or interfered with FMLA rights to which she was entitled.  *Id.*  The parties do not dispute the first four of these elements; their dispute turns on the fifth element.

(1)    January-February 2005 Leave

Plaintiff first claims that Defendants interfered with rights guaranteed her under the FMLA when her duties were changed and she was moved from a salaried to an hourly position after she returned from her February 2005 leave.  In seeking summary judgment on this aspect of Plaintiff's claim, Defendants appear to have ignored the "reinstatement" rights afforded employees under the Act and appear to take the position that an FMLA interference claim only arises when the employer denies a qualified employee's leave request.  *See* Defendants' Brief, pp. 26-27.  They argue that since the Medical Practice granted Plaintiff all of the time off she requested in January-February 2005, her

45

interference claim has no merit.

Defendants overlook the fact that the FMLA not only grants the statutory right for an eligible employee to take up to twelve weeks of leave, but also creates the concomitant right for an employee who has taken leave "to be restored by the employer to the position of employment held by the employee when the leave commenced."  29 U.S.C. § 2614(a)(1)(A); *Hoge, supra*; *Pharakhone v. Nissan N. Am., Inc.*, 324 F.3d 405, 407 (6th Cir. 2003).  Section 2514(a) describes the FMLA restoration right.  It provides, in relevant part:

(a)  Restoration to position

(1)  In general

Except as provided in subsection (b) of this section, any eligible employee who takes leave under section 2612 of this title for the intended purpose of the leave shall be entitled, *on return from such leave --*

> (A) to be restored by the employer to the position of employment held by the employee when the leave commenced; or

> (B) to be restored to an equivalent employment position with equivalent employment benefits, pay, and other terms and conditions of employment.

* * *

(3) Limitations

Nothing in this section shall be construed to entitle any restored employee to--

* * *

> (B) any right, benefit, or position of employment other than

46

> any right benefit or position to which the employee would
> have been entitled had the employee not taken the leave.

29 U.S.C. § 2614(a) (emphasis added).

> An "equivalent position" under 29 U.S.C. § 2614(a)(1)(B) is

> one that is virtually identical to the employee's former position in terms of
> pay, benefits and working conditions, including privileges, perquisites and
> status. It must involve the same or substantially similar duties and
> responsibilities, which must entail substantially equivalent skill, effort,
> responsibility, and authority.

29 C.F.R. § 825.215(a).

However, the "FMLA does not prohibit an employer from accommodating an employee's request to be restored to a different shift, schedule, or position which better suits the employee's personal needs on return from leave. . . . However, an employee cannot be induced by the employer to accept a different position against the employee's wishes." 29 C.F.R. § 825.215(e)(4).

Applying the foregoing authorities in this case, the Court finds that an issue of fact precludes entry of summary judgment in favor of Defendants on Plaintiff's claim of interference with her FMLA rights with regard to her January-February 2005 leave. As indicated above, upon Plaintiff's return to work from her first FMLA leave on February 8, 2005, Plaintiff was relieved of her billing responsibilities, and was made primarily responsible for running the front desk, maintaining an attractive office, and given the further responsibility of monitoring the time of medical residents.. Her desk was removed from the billing department and she was provided, instead, work space in the occupational

47

medicine area of the practice.  Her work schedule was changed to 9 to 5 and she was relieved of her managerial duties in terms of supervising employees.  Her pay was accordingly also changed to hourly instead of by salary (although her benefits and pay rate remained the same).  An issue of fact, thus, exists as to whether Plaintiff was returned to an "equivalent position" upon her return to work after her January-February 2005 leave.  Furthermore, although according to Defendants, the move from management back to non-management employment was done at Plaintiff's request, Plaintiff vehemently denies this.  In the Court's view, these circumstances create issues of fact precluding summary judgment on Plaintiff's February 2005 FMLA interference claim.

(2)     Plaintiff's March 29, 2005 Leave Request

Plaintiff also alleges that Defendants interfered with her right to take a 12-week leave for the birth of her twins (her "second leave") because they laid her off after Dr. Greenspan approved her leave request but before her leave was to commence.  Plaintiff submitted her second FMLA leave request on March 29, 2005, and her request was approved by Dr. Greenspan that same day.  Her leave, however, was not scheduled to commence until approximately five months later, some time in August 2005, to coincide with the anticipated due date of her twins.  Plaintiff's employment, however, was terminated on May 13, 2005.

The right to non-interference with FMLA leave is not absolute. "[A]n employee who requests FMLA leave would have no greater protection against his or her employment being terminated for reasons not related to his or her FMLA request than he

48

or she did before submitting that request." *Grace v. USCAR*, 521 F.3d 655, 670 (6th Cir.

2008) (quoting *Arban v. West Publishing Corp., supra*, 345 F.3d at 402 and *Gunnell v.*

*Utah Valley State Coll.*, 152 F.3d 1253, 1262 (10th Cir.1998)). An employee lawfully may

be dismissed, preventing him or her from exercising his statutory rights to FMLA leave, if

the dismissal would have occurred regardless of the employee's request for, or taking of,

FMLA leave. *Id. See also, Edgar, supra*, 443 F.3d at 508 ("Interference with an

employee's FMLA rights does not constitute a violation if the employer has legitimate

reasons unrelated to the exercise of FMLA rights for engaging in the challenged

conduct.") If the defendant proffers such a justification, then the plaintiff may seek to

rebut it by a preponderance of the evidence. *See Arban*, 345 F.3d at 401. Specifically, a

plaintiff can "refute the legitimate, nondiscriminatory reason that an employer offers to

justify an adverse employment action by showing that the proffered reason (1) has no basis

in fact, (2) did not actually motivate the defendant's challenged conduct, or (3) was

insufficient to warrant the challenged conduct." *Grace supra*, 521 F.3d at 670 (citations

and internal punctuation omitted).

As discussed above, Defendants have come forward with legitimate reasons --

wholly unrelated to her request for FMLA leave -- for terminating Plaintiff's employment.

Defendants' proffered reason for firing plaintiff was reducing the number of employees at

the Medical Practice, and Plaintiff was selected as one of the employees to be RIF'ed

because of her outbursts and disruptive behavior that others were reporting to Greenspan

and because Greenspan believed that strife in the Wixom office was being fueled by her

49

conduct.  *See* discussion in Section III-D of this Opinion.  As further discussed above,

Plaintiff has failed to show, by a preponderance of the evidence, that the proffered reasons

for her discharge had no basis in fact, did not actually motivate her discharge, or were

insufficient to motivate the discharge.  *See id.*  Therefore, Defendants' motion for

summary judgment on this aspect of Plaintiff's FMLA interference claim will be granted.

b.   Plaintiff's Retaliation Claim

Plaintiff also alleges an FMLA retaliation/discrimination claiming that she was

terminated because of her FMLA leave requests.

Like retaliation claims brought under Title VII, to prove a  *prima facie* case of

FMLA retaliation a plaintiff must show that (1) she availed herself of a protected right

under of the FMLA by notifying her employer of her intent to take leave and that her

employer had knowledge of her intent to take leave, (2) plaintiff suffered an adverse

employment action, and (3) that there was a causal connection between the exercise of her

rights under the FMLA and the adverse employment action.  *See Edgar v. JAC Products,

Inc.*, *supra*, 443 F.3d at 508; *Skrjanc v. Great Lakes Power Serv. Co.*, 272 F.3d 309, 313-

316 (6th Cir.2001) (applying the *McDonnell Douglas* analysis to a retaliation claim under

the FMLA).  As noted above, in an FMLA discrimination/retaliation claim the employer's

motive is an integral part of the analysis.  *Edgar*, 443 F.3d 501 at 508.

As under Title VII, the critical element of a *prima facie* FMLA retaliation claim is

the third element -- causal connection.  The Sixth Circuit has held that, in the FMLA

context, proximity in time between the protected activity and the adverse employment

NAV

action may constitute evidence of a causal connection. *Skrjanc*, 272 F.3d at 314; *Bryson v. Regis Corp.*, 498 F.3d 561, 571 (6th Cir. 2007); *Chandler v. Specialty Tires of Am.*, 283 F.3d 818, 826 (6th Cir.2002) (stating that, in the FMLA context, "[p]roximity in time can raise a *prima facie* case of retaliatory discharge").

In *Skrjanc*, the Sixth Circuit held that where a plaintiff's showing of the third element -- causal connection -- is based on indirect evidence, courts are to employ the *McDonnell Douglas* burden shifting analysis. *Skrjanc*, 272 F.3d 309 at 315. Thus, as under *McDonnell Douglas*, once a plaintiff offers sufficient indirect evidence to support a *prima facie* FMLA claim, the burden of production shifts to the defendant to articulate a legitimate, nondiscriminatory reason for the employment decision. *McDonnell*, 411 U.S. at 802-802, 93 S.Ct. 1817. If the employer articulates a legitimate reason for its action, the burden of production shifts back to the plaintiff to demonstrate that the employer's reason is pretext. *Id.* at 804.

While proximity in time may satisfy the *prima facie* causation element, temporal proximity alone is insufficient to establish pretext. *Skrjanc*, *supra*, 272 F.3d at 315. In *Skrjanc*, the Sixth Circuit held that temporal proximity between the date plaintiff informed defendant of his intent to take leave of absence and his discharge one month later was insufficient, in and of itself, to establish that the employer's nondiscriminatory reason for discharging an employee was in fact pretextual.

As set forth above, a plaintiff may show pretext by demonstrating that the proffered reason (1) had no basis in fact; (2) was insufficient motivation for the employment action;

51

or (3) did not actually motivate the adverse employment action.  *See Manzer v. Diamond Shamrock Chem. Co.*, 29 F.3d 1078, 1084 (6th Cir.1994); *Smith v. Chrysler Corp.*, 155 F.3d 799, 805-06 (6th Cir. 1998).

In *Metzler v. Federal Home Loan Bank of Topeka*, 464 F.3d 1164, 1172, (10th Cir. 2006), the court held that the district court correctly concluded that the defendant articulated a legitimate, non-retaliatory reason for terminating the plaintiff.  In *Metzler*, the defendant allegedly terminated plaintiff because of poor job performance, poor attitude, and failure to maintain adequate job-related skills upon her return from FMLA leave.  *Id*. The *Metzler* court reasoned that while evidence of temporal proximity in combination with additional circumstantial evidence may give rise to a genuine issue of material fact regarding whether an employer offered a pretextual reason for terminating an employee, without evidence to demonstrate that defendant's given reasons for terminating her are so weak or implausible to support a reasonable inference that defendant did not act for those reasons, the plaintiff's claim cannot succeed. *Id.* at 1179.

As in *Metzler*, this Court finds that Plaintiff here sufficiently made out a *prima facie* case of FMLA discrimination/retaliation, but she has failed to rebut her employer's legitimate non-discriminatory reasons for her termination.  Plaintiff has not shown, by a preponderance of the evidence, that Defendants' reasons had no basis in fact, were insufficient motivation for her termination or did not actually motivate her termination. *See* Section III-D of this Opinion and Order.  Therefore, summary judgment in favor of the Defendants will be entered on Plaintiff's FMLA retaliation/discrimination claim.

IV. <u>CONCLUSION</u>

For all of the foregoing reasons,

IT IS HEREBY ORDERED that Defendants' Motion for Summary Judgment is GRANTED, IN PART, and DENIED, IN PART.  Defendants' Motion is GRANTED on all of Plaintiff's Title VII and Elliott-Larsen Civil Rights Act claims of pregnancy/sex discrimination (Counts I and IV); hostile work environment (Counts II and V); conspiracy and retaliation (Counts III and VI).  Defendants' Motion is also GRANTED on Plaintiff's claims of discrimination/retaliation under the FMLA (Count XI [sic; VIII]).

With respect to Plaintiff's FMLA interference claims in Count VII of her Complaint, Defendants' Motion for summary judgment is GRANTED with respect to Plaintiff's claim of interference with her FMLA rights with regard to her March 29, 2005 FMLA leave request (her "second leave") but DENIED with regard to Plaintiff's first FMLA leave in January-February 2005.  The case will proceed to trial only on this last claim.

SO ORDERED.


                              s/Gerald E. Rosen_____
                              Chief Judge, United States District Court

Dated:  January 30, 2009

I hereby certify that a copy of the foregoing document was served upon counsel of record on January 30, 2009, by electronic and/or ordinary mail.

                              s/LaShawn R. Saulsberry_____
                              Case Manager